62 A.3d 185

Donnell NANCE

v.

David A. GORDON, et al.

No. 1574, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 1, 2013.

Andrew H. Baida (Rosenberg, Martin, Greenberg, LLP, William H. Murphy, Richard Falcon, The Murphy Firm, Brian J. Nash, Marian L. Hogan, Nash & Associates, LLC, on the brief) Baltimore, MD, for appellant.

Gregory L. VanGeison (Eyelyn C. Lombardo, Harry S. Johnson, Whiteford, Taylor & Preston, LLP, Baltimore, Thomas L. Doran, Anne Marie McGinley, DeCaro, Doran Siciliano, Gallagher & DeBlasio, LLP, Bowie, MD), on the brief, for appellee.

Panel: WOODWARD, BERGER, ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

WOODWARD, J.

Appellant, Donnell Nance, filed a medical malpractice action under the Health Care Malpractice Claims Act ("the Act"), Md.Code (1974, 2006 Repl.Vol., 2012 Supp.) §§ 3–2A–01 to 3–2A–10 of the Courts and Judicial Proceedings Article ("CJP I"), against appellees, David A. Gordon, M.D., Larry Waskow, P.A., and Chesapeake Urology Associates, P.A. ("Chesapeake"). Dr. Gordon is a board certified urologist; Waskow is a urology physician's assistant; and Chesapeake is the professional association employing both Dr. Gordon and Waskow. In his statement of claim, appellant asserted that appellees' negligent care in 2005 was the proximate cause of his subsequent kidney failure.[1] Pursuant to § 3–2A–04(b) of the Act, appellant filed a Certificate of Qualified Expert from Stanley

---

[1] Although appellant is now 22 years old, he was a 15–year–old minor at the time that he received the treatment by appellees relevant to this action.

C. Jordan, M.D., who attested that appellees deviated from the standard of care by "[f]ailing to include nephritis on the differential diagnosis for [appellant] when he presented to the emergency department" complaining of blood in his urine in July of 2005.[2]

In response, appellees filed a Motion to Dismiss or, in the Alternative, for Summary Judgment and argued that Dr. Jordan was not a "qualified expert" under the Act, because Dr. Jordan, a board certified nephrologist, was not in a "related specialty" to appellees. At a hearing before the Circuit Court for Baltimore City, the court found that Dr. Jordan "was not qualified to say what a urologist was able to do," and granted summary judgment in favor of appellees. The circuit court also denied appellant's subsequent motion for reconsideration.

On appeal, appellant presents two questions for our review, which we have rephrased: [3]

1.  Did the circuit court err when it concluded that appellant's medical expert was not qualified to testify under the Act?

2.  If the circuit court did not err in concluding that appellant's medical expert was not qualified, did the circuit court err in granting summary judgment to appellees?

For the reasons we will explain, we answer the first question in the affirmative, and thus reverse the judgment of the

---

2.  Appellant also filed a second Certificate from Dan M. Mayer, M.D., an emergency medicine physician, not otherwise relevant to this appeal.

3.  The questions as posed in appellant's brief read as follows:
    1.  Did the Circuit Court err in granting Defendants' motion for summary judgment on the ground that Plaintiff's expert, a board certified nephrologist, was not qualified under the Act to testify that a urologist, a physician's assistant, and their employer violated the standard of care in treating Plaintiff?
    2.  If the Circuit Court correctly held that Plaintiff's expert was not qualified, did the Circuit Court err by granting Defendants' motion for summary judgment and directing the entry of judgment in favor of Defendants and against Plaintiff, rather than ordering that this action be dismissed without prejudice?

circuit court and remand the case to that court for further proceedings. Consequently, we do not reach appellant's second question.

## *BACKGROUND*

On June 2, 2005, appellant presented to (*i.e.*, arrived at) the emergency department at Sinai Hospital in Baltimore, complaining of blood in his urine. Urinalysis taken at the hospital verified that appellant had gross hematuria (blood in urine), as well as proteinuria (protein in urine). Following these test results, appellant was prescribed antibiotics for what was diagnosed as a urinary tract infection and sent home.[4]

On July 27, 2005, appellant, accompanied by his mother, again presented to the Sinai Hospital Emergency Department, complaining about blood in his urine. This time, appellant complained further of a fever, sore throat, and right flank pain. Waskow examined appellant. Waskow then called and spoke with Dr. Gordon to review appellant's presentation, and to discuss Waskow's examination, evaluation, and treatment plan. However, no *physician* ever conducted an in-person evaluation or examination of appellant for his symptoms that day. Again, appellant was sent home with antibiotics to treat a urinary tract infection.

Nearly two years later, on May 28, 2007, appellant presented to the Sinai Hospital Emergency Department, complaining that he was spitting up blood. Tests conducted at the hospital revealed that appellant's kidneys were no longer functioning. Physicians present noted that appellant had been doing "reasonably well" up until a few weeks before his May 2007 presentation, when he began experiencing flu-like symptoms. A renal biopsy revealed that appellant had late-stage IgA nephropathy, a severe kidney disease that requires appellant to undergo hemodialysis three times a week. Doctors concluded that the kidney disease had "progressed too long

---

4. Appellant was treated in June 2005 by physicians who are not parties in the instant appeal.

without treatment," and that the failure of appellant's kidneys was irreversible.

On April 17, 2009, appellant filed a Statement of Claim with the Health Care Alternative Dispute Resolution Office ("HCADRO"). In addition to his Statement of Claim, appellant also filed a Waiver of Arbitration. The HCADRO issued an Order of Transfer from its office to the circuit court on April 21, 2009. Appellant then filed a complaint in the circuit court on May 8, 2009.

Also accompanying appellant's April 17, 2009 Statement of Claim was Dr. Jordan's Certificate and attached report. Dr. Jordan is board certified in pediatric nephrology, pediatrics, and diagnostic laboratory immunology. In his Certificate, Dr. Jordan opined that appellees (among others) "departed from the standards of practice among members of the same health professions with similar training and experience situated in the same or similar communities" when they treated appellant in June and July 2005. In his report, which was attached to the Certificate, Dr. Jordan specifically stated that, in his professional opinion, appellees (among others) committed malpractice by "[f]ailing to include nephritis on the differential diagnosis for [appellant]" when he presented to the Sinai emergency room in June and July 2005. Dr. Jordan further opined that these deviations from standards of care proximately caused appellant's injuries and damages.

Following the close of discovery, on July 30, 2010, appellees filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. In their motion, appellees argued, as relevant to this appeal, that Dr. Jordan was not a "qualified" expert, because he is not a board-certified urologist, and because he did not have relevant clinical or teaching experience in a "related field of health care" to urology. After appellant filed an opposition and appellees a reply, the circuit court held a hearing on appellees' motion on August 23, 2010. At the conclusion of the hearing, the court granted appellees' motion, ruling that Dr. Jordan "was not qualified to say what a urologist was able to do." The following day, the circuit court

issued an order granting summary judgment in favor of appellees.

On September 1, 2010, appellant filed a motion for reconsideration of the circuit court's order. The circuit court held a hearing on the motion on November 22, 2010, and denied appellant's motion. On the same day, the court issued a written order denying the motion for reconsideration and entering a final judgment in favor of appellees.

A timely appeal followed. Additional facts will be set forth below as necessary to resolve the issues presented.

### DISCUSSION

The instant appeal involves appellant's claim for medical malpractice under the Act, CJP I §§ 3–2A–01 to 3–2A–10. Appellant asserts that the appellees breached the applicable standard of care by failing to include nephritis in a differential diagnosis for appellant when he presented himself to appellees. Because appellant's claims are based on breach of the standard of care, appellant was required to file a "certificate of qualified expert" ("Certificate")[5] within 90 days of the date of filing his claim. *See* CJP I §§ 3–2A–04(b)(1).

In appellant's claim for medical malpractice, as in all claims "filed on or after January 1, 2005," the Certificate is only proper if it complies with the further, specific requirements of section 3–2A–02(c)(2). Subparagraph 3–2A–02(c)(2)(ii) of the Act provides:

> 1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

---

5. As the Court of Appeals has noted, some sources refer to the certificate as a "certificate of qualified expert," while others use "Certificate of Merit." *See, e.g., Carroll v. Konits*, 400 Md. 167, 171 n. 2, 929 A.2d 19 (2007). For the sake of clarity and conciseness, we will follow their practice in referring to the filed document as a "Certificate."

A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine **in the defendant's specialty or a related field of health care,** or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action; and

B. Except as provided in subsubparagraph 2 of this subparagraph, if the defendant is board certified in a specialty, shall be board certified in **the same or a related specialty** as the defendant.

2. Subsubparagraph 1B of this subparagraph does not apply if:

A. The defendant was providing care or treatment to the plaintiff unrelated to the area in which the defendant is board certified; or

B. The health care provider taught medicine **in the defendant's specialty or a related field of health care.**

CJP I § 3–2A–02(c)(2)(ii) (emphasis added).

■ "[I]t is not necessary for a certifying or testifying expert witness in a medical malpractice case to be the same kind of health care provider as the defendant." *Hinebaugh v. Garrett Cnty. Mem'l Hosp.*, 207 Md.App. 1, 20, 51 A.3d 673 (2012). As the Act explains in subsubparagraphs 1A, 1B, and 2B, an expert need only satisfy certain professional qualifications in "the same *or a related* specialty [or field]" to submit a valid Certificate (subject to the remaining procedural requirements). CJP I §§ 3–2A–02(c)(2)(ii)1A, –1B, –2B (emphasis added).[6]

---

6. Appellant contends that "[t]he Act incorporates the common law rule that an expert need not be a specialist to be qualified to testify about the governing standard of care." Specifically, appellant relies on *Radman v. Harold*, 279 Md. 167, 171, 367 A.2d 472 (1977), in which the Court of Appeals wrote that, "we have never treated expert medical testimony any differently than other types of expert testimony...." Appellees disagree, contending that "[s]ection 3–2A–02(c) of the ... Act abrogates the common law tenets governing medical expert testimony," serving as

Appellant contends that "[t]he Circuit Court erred ... because Dr. Jordan was qualified under the Health Care

---

a "statutory abolition of the *Radman* rule." The answer, in our view, lies somewhere between these two positions.

In evaluating these arguments, we are guided by the principles restated by the Court of Appeals in *Walzer v. Osborne*, 395 Md. 563, 911 A.2d 427 (2006):

Statutes in derogation of the common law are strictly construed, and it is not to be presumed that the legislature by creating statutory assaults intended to make any alteration in the common law other than what has been specified and plainly pronounced. Because statutes in derogation of the common law are disfavored, the maxim *expressio unius est exclusio alterius* has been extensively employed to avoid repeal of the common law, and refuted in order to make the statute cumulative with it. Most statutes, of course, change the common law, so that principle of narrow construction necessarily bends when there is a clear legislative intent to make a change.

*Id.* at 573–74, 911 A.2d 427 (internal quotation marks, citations, and footnote omitted). *Expressio unius est exclusio alterius* is a canon of statutory construction that means that " 'to express or include one thing implies the exclusion of the other, or of the alternative.' " *Breslin v. Powell*, 421 Md. 266, 287–88, 26 A.3d 878 (2011) (quoting BLACK'S LAW DICTIONARY 661 (9th ed.2009)).

Section 3–2A–10 of the Act, entitled "Construction of subtitle," states:

Except as otherwise provided in §§ 3–2A–08A and 3–2A–09 of this subtitle, the provisions of this subtitle shall be deemed procedural in nature and **may not be construed to create, enlarge, or diminish any cause of action not heretofore existing, except the defense of failure to comply with the procedures required under this subtitle.**

CJP I § 3–2A–10 (emphasis added). The text of this section unambiguously provides, among other things, that any party who wishes to challenge a Certificate on the grounds that the party who filed the Certificate "fail[ed] to comply with the procedures required" under §§ 3–2A–02 and 3–2A–04 of the Act may do so. Contrary to appellant's argument, "the certificate requirement is in derogation of the common law, intended to place *additional* requirements on a claimant." *Breslin,* 421 Md. at 284, 26 A.3d 878 (emphasis in original) (footnote omitted); *see also DeMuth v. Strong,* 205 Md.App. 521, 541, 45 A.3d 898 (2012) (noting that the requirements set forth in subsection (c)(2) of the Act are "qualification *prerequisites* " to whether an expert is allowed to testify) (emphasis added). Thus, in addition to the requirements at common law as set forth by Maryland Rule 5–702, "experts certifying or testifying in medical malpractice cases" must first clear the hurdles of section 3–2A–02(c). *DeMuth,* 205 Md.App. at 541, 45 A.3d 898. We previously summarized the interrelationship between determining whether an expert is qualified by a valid Certificate and whether the expert's testimony is admissible, as follows:

If the [Certificate] prerequisites are not satisfied, the expert cannot submit a valid Certificate or testify at a trial or hearing. **If the prerequisites are satisfied, then, with respect to testimony, the court**

Malpractice Claims Act to express the opinion that [appellees] violated the standard of care in treating [appellant]." Appellant asserts that "specializing in the same medical field [as the defendant(s) in a medical malpractice suit] is not required" in order for an expert like Dr. Jordan to be qualified. Appellant then argues that "Dr. Jordan's Certificate of Qualified Expert, supporting Report, and deposition testimony established that nephrology and urology are 'related' specialties" in the context of this case, because "[n]ephrology and urology share the kidney as a common focus."

In response, appellees argue that "[t]he plain language of the [Act], and this Court's application of that language in *DeMuth v. Strong*, 205 Md.App. 521, 45 A.3d 898 (2012), and *Hinebaugh*,[7] ... demonstrate that, for Dr. Jordan's certificate to have been valid, Appellant[ ] bore the burden of showing that Dr. Jordan's specialty, pediatric nephrology, overlapped with the Appellees' specialty, urology, with regard to the diagnosis of nephritis in the emergency room setting." Appellees claim that "[t]he evidence before [the circuit court] showed that no such overlap existed," because nephrologists "diagnose and treat nephritis," while urologists do not.

The Court of Appeals previously explained in *Carroll v. Konits*, 400 Md. 167, 929 A.2d 19 (2007), that

[t]he determination of whether a Certificate and report are satisfactory, like the determination of whether a complaint sufficiently states a legally cognizable claim, is a determination to be made as a matter of law. As such, the standard for determining whether a Certificate or report is legally sufficient is the same as determining whether a complaint is legally sufficient, i.e., dismissal is only appropriate if, after assuming the truth of the assertions in the Certificate and report, and all permissible inferences emanating therefrom,

---

or panel chairman will determine the admissibility of the expert's testimony at the trial (or hearing), pursuant to Rule 5–702.
*Id.* (emphasis added).

7. We note that the circuit court did not have the benefit of our opinion in either *DeMuth* or *Hinebaugh* both when it made its original ruling in August 2010 and when it decided appellant's motion for reconsideration in November 2010.

the requirements set forth in the Health Care Malpractice Claims Statute are not satisfied.

*Id.* at 180 n. 11, 929 A.2d 19. "In sum, because we must deem the facts to be true, our task is confined to determining whether the trial court was legally correct in its decision to dismiss." *Debbas v. Nelson,* 389 Md. 364, 372, 885 A.2d 802 (2005).

The dispute between the parties in the instant appeal centers on whether nephrology and urology are "related" fields under the circumstances of this case, as that term is used in subsubparagraphs §§ 3 –2A–02(c)(2)(ii) 1A and 1B of the Act. " 'The meaning of statutory text is an issue we review as a matter of law'—*i.e., de novo.*" *DeMuth,* 205 Md.App. at 535, 45 A.3d 898 (quoting *Univ. of Md. Med. Sys. Corp. v. Waldt,* 411 Md. 207, 222, 983 A.2d 112 (2009)).

In carrying out this review, we are guided by the following well-established principles of statutory construction:

When undertaking an exercise in statutory interpretation, as in the present case, the goal is to "ascertain and effectuate the intent of the Legislature." In attempting to discern the intent of the Legislature, courts "look first to the plain language of the statute, giving it its natural and ordinary meaning." If the language of the statute is clear and unambiguous, courts will give effect to the plain meaning of the statute and no further sleuthing of statutory interpretation is needed. If the sense of the statute is either unclear or ambiguous under the plain meaning magnifying glass, courts will look for other clues—*e.g.,* the construction of the statute, the relation of the statute to other laws in a legislative scheme, the legislative history, and the general purpose and intent of the statute.

It is well-settled that a court must read a statute in the context of its statutory scheme, ensuring that "no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory," and that any illogical or unreasonable interpretation is avoided.

*Id.* (quoting *Breslin,* 421 Md. at 286–87, 26 A.3d 878 (citations omitted)).

Because "[t]he word 'related' is not defined in the Act," we have looked to dictionary definitions of the word and concluded that, as used throughout CJP I § 3–2A–02(c)(2), "related" means " 'being connected; associated.' " *Id.* at 536, 45 A.3d 898 (quoting AMERICAN HERITAGE DICTIONARY 1473 (4th ed.2006)). In *DeMuth,* the patient presented to the defendant, a board certified orthopedic surgeon, in 2005, complaining of pain in his knees. *Id.* at 525, 45 A.3d 898. On February 14, 2008, with the patient's consent, the defendant performed total knee replacement surgery on the patient's left knee. *Id.* at 526, 45 A.3d 898. Immediately after this surgery, the patient complained of numbness and tingling in his left foot; the defendant's postoperative examination did not show any signs of a decrease in blood flow to the left leg. *Id.* The defendant diagnosed the patient's postoperative condition as neuropraxia, a non-serious condition that was not vascular (*i.e.,* related to blood flow) in nature. *Id.* The next day, after the patient was unable to move or bend upward his left toes, the defendant again reviewed the patient's notes and, again, concluded that this condition was neuropraxia. *Id.* at 526–27, 45 A.3d 898. Ultimately, after the patient's condition worsened, his left leg was amputated above the knee. *Id.* at 529, 45 A.3d 898. At the patient's trial for malpractice against the defendant, the patient called a vascular surgeon to testify that the defendant, as an orthopedic surgeon, breached the standard of care in several discreet and specific ways following the February 14 surgery. *Id.* at 529–31, 45 A.3d 898. The trial court permitted the vascular surgeon's testimony. *Id.* at 532, 45 A.3d 898.

On appeal, this Court affirmed the decision of the trial court. In a case of first impression, we were faced with the issue of interpreting the meaning of "related" as used in section 3–2A–02(c)(2) of the Act. *Id.* at 536–37, 45 A.3d 898. Judge Deborah Eyler, writing for this Court, stated that

the word "related" in the sense of associated or connected, as used to modify "field of health care" and board certification "specialty" in subsubparagraphs 1A and 1B, respective-

ly, embraces fields of health care and board certification specialties that, in the context of the treatment or procedure in a given case, overlap.

*Id.* at 544, 45 A.3d 898. The *DeMuth* Court adopted significant portions of the reasoning from the federal district court's opinion in *Jones v. Bagalkotakar*, 750 F.Supp.2d 574 (D.Md. 2010). See 205 Md.App. at 542–44, 45 A.3d 898. Specifically, we highlighted the passage of the Jones decision explaining that,

> [i]f the procedure is one which both healthcare providers have experience with and the standard of care is purported to be similar, then the expert's qualifications satisfy the requirements of the Act. If a procedure is common to two specialties, an inference of relation is created between the two specialties. However, if the procedure is one [with] which the purported expert does not have experience or performs with a meaningfully different standard of care, then the expert does not qualify under the Act.

205 Md.App. at 543–44, 45 A.3d 898 (quoting *Jones,* 750 F.Supp.2d at 581) (second alteration in original).

Applying the above principles to the facts of *DeMuth,* we noted that the vascular surgeon was not being asked to give and did not give standard of care testimony about the performance of knee replacement surgery. *Id.* at 545. Instead, the vascular surgeon's "opinions focused solely on the postoperative care and treatment of patients who have undergone that surgery." *Id.* Because the central standard of care issue in the case was "the proper postoperative diagnosis and treatment of possible vascular complications of orthopedic surgery," we concluded that there was an "overlap" between the specialties of vascular and orthopedic surgery, and therefore, vascular surgery and orthopedic surgery were "related specialt[ies]" under the board certification requirement in CJP I § 3–2A2(c)(2)(ii)1B. *Id.* at 546 (alteration in original).

Later, in *Hinebaugh,* 207 Md.App. at 22, 51 A.3d 673 we stated that *DeMuth* stands for the proposition that, where medical specialties overlap in the context of a particular

treatment or procedure, "there also is an overlap of knowledge of the treatments and procedures among those health care providers certified in either specialty." For example, where

> the treatment rendered is performed by both specialists and therefore is within the overlapping expertise of two board specialty areas, so that both board certified specialists should be equally knowledgeable and competent to testify about the prevailing standard of care for a health care provider board certified in either specialty, the specialties are "related". . . .

*Id.* at 23, 51 A.3d 673.

In *Hinebaugh,* the patient-appellant was hit in the face, absorbing injuries to his jaw and left cheek. *Id.* at 6, 51 A.3d 673. The appellant was examined by a family medicine doctor, who ordered x-rays to the appellant's facial bones. *Id.* Two radiologists evaluated these x-rays and concluded that there were no abnormalities to the appellant's cheek bones. *Id.* The appellant subsequently reported increasing pain and numbness in the cheek, and was seen by a second family medicine doctor, who ordered a CT scan. *Id.* at 6–7, 51 A.3d 673. Upon reading the CT scan, the second family medicine doctor diagnosed the appellant with a supraorbital fracture. *Id.* at 7, 51 A.3d 673. The appellant then filed suit under the Act against the first family medicine doctor and the radiologists, and sought to qualify a doctor of dental surgery, who specialized in Oral and Maxillofacial Surgery (OMS), as an expert. *Id.* at 7–8, 51 A.3d 673. The OMS dentist attested that the first family medicine doctor and the radiologists breached the standard of care by failing to diagnose the appellant's condition (a supraorbital fracture) in a timely fashion. *Id.* at 8, 51 A.3d 673.

On appeal, we held that the expert whom the appellant offered was not qualified, because "[u]nder circumstances such as those in this case, the areas of knowledge and experience of board certified family medicine and radiology doctors do not overlap the areas of knowledge and experience of board

certified OMS dentists." *Id.* at 26, 51 A.3d 673. We framed the issue as

> whether the specialties of family medicine ... and OMS ... and the specialties of radiology ... and OMS ... are "related" in the context of the diagnosing, on a front line basis, of the medical condition of a patient who has been hit in the face by another person and is experiencing pain.

*Id.* at 23, 51 A.3d 673. We reasoned that an OMS specialist, like the appellant's expert, is only involved after the fracture is diagnosed; unlike family medicine doctors and radiologists, the OMS dentist's services are not "sought out by front line doctors presented with a complaint by a patient of being hit in the face when a simple x-ray does not reveal any fracture." *Id.* at 27, 51 A.3d 673. We further explained that "it is not proper for an OMS dentist ... to express an opinion about the standard of care that governs a family medicine doctor or a radiologist" in "the diagnosis of facial fractures in initially presenting patients." Id. at 29, 51 A.3d 673.

In the case *sub judice,* Dr. Jordan stated in his Certificate that he is board certified in nephrology, and in his deposition, he testified that he is certified in "pediatric nephrology, pediatrics, and diagnostic laboratory immunology." Dr. Jordan testified that he is also a practicing nephrologist and had worked in that position for 24 years at the time of his deposition in April 2010. In addition, in his Certificate, Dr. Jordan attested that the appellees (among others) departed from the standard of care by "fail[ing] to properly evaluate and/or diagnose and/or consider on their differential [sic] [appellant's] condition of nephritis on June 2, 2005 and again on or about July 27, 2005." In his report, which was attached to the Certificate, Dr. Jordan opined that appellees (among others) departed from the standard of care by "[f]ailing to include nephritis on the differential diagnosis for [appellant] when he presented to the emergency department at Sinai Hospital of Baltimore, Inc." on both June 2 and July 27, 2005. The issue for this Court to decide, therefore, is whether the specialties of nephrology (Dr. Jordan) and urology (appellees) are "related" under the Act in the context of developing a

differential diagnosis for a patient who presents to the emergency department with blood and protein in his or her urine. *Cf. Hinebaugh,* 207 Md.App. at 23, 51 A.3d 673.

As a preliminary matter, we agree with appellant that nephrology and urology share a common focus on the kidneys. Urology is "[t]he medical specialty concerned with the study, diagnosis, and treatment of diseases of the genitourinary tract." PDR MEDICAL DICTIONARY 2076 (3d ed.2006) ("PDR"); STEDMAN'S MEDICAL DICTIONARY 1917 (27th ed.2000) (same) ("STEDMAN'S"). Although these dictionaries do not strictly define "genitourinary tract," they do clarify that the urinary tract consists of "the passage from *the pelvis of the kidney* to the urinary meatus through the ureters, bladder, and urethra." PDR at 2012; STEDMAN'S at 1856 (same) (emphasis added). Indeed, *Gray's Anatomy,* a textbook widely used in the medical profession, states that

**[t]he urinary organs comprise:**

- **two *kidneys* (*renes* )** producing urine;
- *ureters,* conveying it to the pelvic urinary viscera, namely
- the *urinary bladder (vesica urinaria)* for temporary storage;
- the *urethra* by which the bladder empties.

GRAY'S ANATOMY 1814 (38th ed.1995) (emphasis added). Nephrology, by comparison, is "[t]he branch of medical science concerned with medical diseases of the kidneys." PDR at 1290; STEDMAN'S at 1191 (same). Nephritis, the condition that appellant developed, is "[i]nflammation of the kidneys." PDR at 1289; STEDMAN'S at 1190 (same).

Merely sharing a common organ, however, is not sufficient, by itself, to compel the conclusion that nephrology and urology are "related specialt[ies]" for purposes of qualifying Dr. Jordan as an expert under the Act. We must review the circumstances of this case and determine whether nephrology and urology "overlap" in the context of "the treatment or procedure" at issue. *DeMuth,* 205 Md.App. at 544, 45 A.3d 898.

██ We conclude that nephrology and urology are "related" in the case *sub judice,* because "the treatment rendered" (a differential diagnosis at the time the patient presents to the emergency room) is "performed by both specialists" (both Dr. Jordan and appellees). *See Hinebaugh,* 207 Md.App. at 23, 51 A.3d 673. A differential diagnosis is "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." PDR at 531; STEDMAN'S at 491–92. Of particular significance to this case, a differential diagnosis requires the physician to consider the diseases "that are *possibly responsible* for the patient's illness." ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY, at D20 (Ida G. Dox et al. eds., West 1997) (emphasis added). Thus Dr. Jordan opined, in effect, that appellees breached the standard of care by failing to consider nephritis as a disease that was "possibly responsible" for the blood and protein in appellant's urine.

The record reveals that Dr. Jordan personally participated in the same kinds of "on-call services for emergency departments" as the treatment appellant received in the instant case from appellees. During his deposition, Dr. Jordan had the following exchange with appellees' counsel:

Q: In your current practice over the last 10, 20 years, have you ever provided on-call services for emergency departments?

A: Yes.

Q: Describe your experience in that regard.

A: Well, in my role as director of nephrology and—at Cedars–Sinai Medical Center and director of the kidney transplant program, **we're actively involved with the emergency room at our hospital on a day-to-day basis with any—with consults regarding matters related to medical kidney diseases** or patients with transplant problems who may come to our emergency room. We have a 24/7 service available in our group.

Q: And you personally participate in taking call?

A:   Absolutely.

(Emphasis added).

Thus, unlike the OMS dentist who sought to be qualified in *Hinebaugh*—and like family medicine doctors, radiologists, and general urologists—Dr. Jordan, as a nephrologist who is actively involved in emergency room consults, is a "front line health care provider[ ]." [8] *Cf. Hinebaugh,* 207 Md.App. at 28–29, 51 A.3d 673.

Later in his deposition, Dr. Jordan further explained the nature of his responsibilities when performing an emergency room consult:

Q:   Have you ever had occasion—**have you had occasion, when you see patients in an emergency department as a consultant, to refer patients to other specialists?**

A:   **Yes.**

Q:   When's the last time you did that?

A:   Oh, we do it all the time.   We have patients who come in that have—that are—that we—patients that we are taking care of, for example, our kidney transplant patients, **the patients may have a urinary tract obstruction, we would refer that to the urologist.   That probably happens three or four times a week.**

Patients may have other medical issues that we would refer to infectious disease or neurology.   It's a—we have a very big, busy practice, both nephrology and kidney

---

**8.**   Appellees note that on the Consultation Report form following appellant's July 27, 2005 visit, Dr. Gordon recommended that appellant "should be referred to a pediatric nephrologist for further evaluation." Appellees also note that the discharge instructions given to appellant's mother on that day recommended that she "follow up with pediatric nephrology—Dr. Mendley at University of Maryland."   Whether any such referral was made, however, goes to the issue of whether the standard of care was complied with.   It does not address the issue of the instant appeal—namely, whether *Dr. Jordan* is qualified to define the standard of care itself and to opine as to whether such standard was breached.

transplant. We're referring patients multiple times a week. And we do have a lot—

       \*      \*      \*

**[W]e refer a lot of patients to urologists.**

       \*      \*      \*

Q: **And what are the types of things you refer these patients to urology for?**

A: **It varies. Most of the time it's obstruction of the kidney.** We have kidney stones. We have polycystic kidney disease that may need operation or removal. Patients may have multiple other surgical issues of the kidney, such as lymphoceles that are draining or need to be drained. **Basically, the gamet [sic] of surgical kidney diseases.**

(Emphasis added).

As this testimony reveals, Dr. Jordan has experience with consults for emergency room patients who present both with medical issues of the kidney *and* with urinary tract obstructions and surgical kidney diseases. In other words, Dr. Jordan is familiar with the medical conditions and diseases normally treated by nephrologists and urologists that may be presented in an emergency room setting.

Most significant to the case *sub judice,* Dr. Jordan testified at length about his familiarity with emergency room consults for patients who present with blood and protein in the urine:

Q: Are you ever—**have you ever been called upon, in the last 10 years, to see a patient in an emergency department setting with a presentation of hematuria and proteinuria?**

A: **Absolutely. Many times.**

Q: On approximately how many occasions in the last 10 years?

A: I would say probably 20.

Q: And are these patients who have already been diagnosed with glomerulonephritis or are these patients without a diagnosis?

A: Both.

Q: And what is your role when you're called upon to see these patients? How is it that you're called in? Are you called by the emergency department attending or are you called by another specialist? How does it normally work?

A: Both. We will either—often, most often I will be called by the emergency room doctor with a problem, a kidney—a nephrologic problem in terms of consultation, especially when we're on the on-call rotation. We will go in and see the patient, evaluate them. Sometimes I am called by a nephrologist who's already seen the patient and wants a second opinion or a confirming opinion.

Q: Are you ever called by a urologist?

A: Yes.

Q: In the emergency department setting?

A: That's fairly rare, but that has happened.

(Emphasis added).

Dr. Jordan's testimony that he has seen "patient[s] in an emergency department setting with a presentation of hematuria and proteinuria," and that at least some of these patients have presented "without a diagnosis," makes clear that he has evaluated patients similar to appellant in the instant case. Such evaluation would involve a differential diagnosis, which, as we have explained, is a procedure carried out on patients before any final diagnosis is made, during which physicians consider the universe of conditions "that are possibly responsible for the patient's illness." A differential diagnosis of a patient similar to appellant would involve knowledge of possible medical conditions and diseases treated by both nephrologists and urologists. Consequently, the procedure at issue in the instant case-preparing a differential diagnosis of a patient

who presents with blood and protein in his or her urine—"is one which both healthcare providers [*i.e.*, Dr. Jordan and appellees] have experience with." *DeMuth*, 205 Md.App. at 543–44, 45 A.3d 898 (quoting *Jones*, 750 F.Supp.2d at 581).

Nevertheless, appellees argue that there is no overlap, because "[n]ephrologists diagnose and treat nephritis[,]" and "[u]rologists do not." In support of this argument, appellees point to Waskow's deposition testimony that "[d]iseases of the ... kidneys are not within our scope of practice." This argument is without merit, because the particular procedure or treatment at issue in the instant case is the preparation of a *differential* diagnosis from an emergency room consult involving a patient who presents with blood and protein in his or her urine, and not the *final* diagnosis and treatment of nephritis, as appellees argue. As previously stated, such differential diagnosis must take into consideration *possible* medical conditions or diseases treated by both nephrologists and urologists.

For the foregoing reasons, we conclude that under the circumstances of the case *sub judice*, nephrology and urology are "related specialt[ies]" pursuant to section 3–2A–02(c)(2) of the Act.[9] We hold, therefore, that the trial court erred in ruling that Dr. Jordan was not qualified to testify as an expert under the Act.

---

9. Appellant advances two alternative arguments that we do not reach, for different reasons. First, appellant contends that "Dr. Jordan had clinical experience, provided consultation relating to clinical practice, and taught medicine in a 'related' field of health care" by teaching "nephrology, transplant medicine, immunosuppression, and transplant immunology to urology trainees, medical students, residents, fellows, and physician assistants." Because we have concluded that under the circumstances of the instant case, nephrology and urology are "related specialties" within the meaning of the Act, we need not reach the merits of this argument.

Second, appellant claims that, even if Dr. Jordan is not board certified in a "related" specialty, his Certificate is still valid because the appellees were "providing care or treatment to [appellant] unrelated to the area in which [appellees are] board certified." Appellant fails to present any argument in support of this contention as required by Maryland Rule 8–504(a)(6). Thus, even if we reached this argument, we would not agree with appellant.

46

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-
MORE CITY REVERSED; CASE REMANDED TO THAT
COURT FOR FURTHER PROCEEDINGS CONSISTENT
WITH THIS OPINION.   APPELLEES TO PAY COSTS.