*Melissa Phillips Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.,* et al., No. 1049, Sept. Term, 2021. Opinion by Albright, J.

**Healthcare Malpractice Claims Act – Certificate of Qualified Expert – Sufficiency –** In a medical malpractice case where the standard of practice is at issue, if the defendant is board certified, then the expert who signs a Certificate of Qualified Expert supporting the claimant's or plaintiff's case must also be board certified, unless an exception applies. There is an exception for experts who taught medicine in the defendant's specialty or a related field, and that exception applies regardless of when the expert's teaching experience occurred. Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii).

**Healthcare Malpractice Claims Act – Certificate of Qualified Expert – Dismissal for Failure to File –** If the claimant or plaintiff fails to file a timely and proper Certificate of Qualified Expert, then the case must be dismissed without prejudice. A court does not have discretion to dismiss the case with prejudice. Md. Code, Cts. & Jud. Proc. § 3–2A–04(b)(1).

Circuit Court for Prince George's County
Case No. CAL20-03390

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 1049

September Term, 2021

MELISSA PHILLIPS JORDAN

v.

ELYASSI'S GREENBELT ORAL &
FACIAL SURGERY, P.C., ET AL.

Reed,
Shaw,
Albright,

JJ.

Opinion by Albright, J.

Filed: December 29, 2022

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

\* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

This case presents an issue of statutory construction. We must interpret Section 3–2A–02(c)(2)(ii) of the Courts and Judicial Proceedings Article, which is part of the Healthcare Malpractice Claims Act ("HCMCA").[1] Under the HCMCA, the plaintiff in a medical malpractice action typically must file a valid Certificate of Qualified Expert ("CQE") to support a claim of malpractice.[2] Otherwise, the malpractice claim cannot proceed. A valid CQE must be signed by an attesting expert, and Section 3–2A–02(c)(2)(ii) sets forth certain requirements that the attesting expert must have met within five years of the alleged malpractice at issue. If the defendant is board certified in a specialty,[3] the statute also imposes a further requirement on the attesting expert (board certification in the same or a related specialty), as well as two exceptions to that requirement. This appeal concerns the scope of the second exception to the board certification requirement: the exception for an attesting expert who "taught medicine in

---

[1] *See* Md. Code (1974, 2013 Repl. Vol.), Cts. & Jud. Proc. § 3–2A–01, *et seq*.

[2] A CQE is sometimes also referred to as a "Certificate of Merit" or a "Certificate." There are situations, not relevant here, where certain CQE requirements will not apply. There are also situations where a CQE need not be filed, such as when the sole issue is lack of informed consent. *See* Md. Code, Cts. & Jud. Proc. § 3–2A–04(b).

The HCMCA's CQE requirements apply equally to plaintiffs and to claimants who file claims with the Health Care Alternative Dispute Resolution Office ("HCADRO"). *See* Md. Code, Cts. & Jud. Proc. §§ 3–2A–02(c)(2)(i), 3–2A–04(b). As such, we will use the term "plaintiff" here to refer to both plaintiffs and claimants.

[3] Board certification is an additional credential available to certain medical professionals. Typically, a board certification requires further training and satisfactory exam performance. As we have previously noted, the American Board of Medical Specialties identifies medical specialties and the entities that offer board certification in those specialties. *See DeMuth v. Strong*, 205 Md. App. 521, 545 n.6 (2012).

the defendant's specialty or a related field[.]" *See* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii)(2)(B).

The Appellant, Dr. Melissa Phillips Jordan,[4] brought a malpractice action against the Appellees, Dr. Ali Reza Elyassi, and his practice, Elyassi's Greenbelt Oral & Facial Surgery, P.C., in the Circuit Court for Prince George's County. Dr. Elyassi is board certified in a specialty, and the attesting expert who signed Dr. Jordan's CQE is not. The attesting expert, however, has clinical experience in a related field within five years of the alleged malpractice at issue. He also taught as an assistant professor in that same field for approximately two years during the 1970s (decades before Dr. Jordan's claim arose). At that time, however, the technologies used in that field had not advanced to the point that they are at today, and the attesting expert did not teach the procedures that Dr. Elyassi used in treating Dr. Jordan because they had not yet been developed. On Dr. Elyassi's motion, the circuit court struck Dr. Jordan's CQE and dismissed her complaint with prejudice, holding that the attesting expert's teaching experience was not recent enough to satisfy the exception to the board certification requirement. Dr. Jordan timely appealed, posing two questions for our consideration:

1. Did the Circuit Court err by determining that Appellant's CQE was insufficient because the certifying expert had not taught medicine in Dr. Elyassi's specialty or a related field of health care within five years of his alleged underlying negligence?

2. Did the Circuit Court err by dismissing Appellant's Complaint with prejudice?

---

[4] Dr. Jordan's current legal name is Melissa Dawn Phillips.

2

We answer both questions in the affirmative. In so doing, we conclude that an expert who taught medicine[5] in a related field satisfies an exception to the board certification requirement, pursuant to Section 3–2A–02(c)(2)(ii)(2)(B) of the Courts and Judicial Proceedings Article, regardless of when that teaching experience occurred. In the alternative, we conclude that the circuit court erred in dismissing Dr. Jordan's complaint with prejudice.[6] We will reverse the judgment of the circuit court.

## BACKGROUND

### I.    TREATMENT OF DR. JORDAN

For purposes of this appeal, we accept as true the allegations in Dr. Jordan's complaint, which we summarize as follows. Dr. Elyassi is a board certified oral and maxillofacial surgeon and the owner of his surgery practice, Elyassi's Greenbelt Oral & Facial Surgery, P.C. In 2017, Dr. Elyassi provided treatment to Dr. Jordan related to two dental implants, which had been installed some years prior. As part of the treatment, Dr. Elyassi removed Dr. Jordan's existing dental implants and installed replacements, a procedure involving both implant placement and bone grafting. That procedure failed. Dr. Jordan returned to Dr. Elyassi about two weeks later, complaining of persistent pain and discomfort. Dr. Elyassi performed additional work, but Dr. Jordan was nonetheless left

---

[5] Here, the attesting expert taught for approximately two years as an assistant professor at a university.

[6] Because it has been rendered unnecessary to decide, we will not address the parties' dispute over whether the CQE could be valid as to Dr. Elyassi's practice, even if it is invalid as to Dr. Elyassi.

with a postoperative infection and a need for further surgery. Eventually, Dr. Jordan

sought treatment from a different provider unaffiliated with Dr. Elyassi's practice, who

provided Dr. Jordan with additional diagnostic and surgical care.

## II.     CIRCUIT COURT LITIGATION

Approximately two years after the failed procedure, Dr. Jordan filed a complaint

against Dr. Elyassi and his practice in the circuit court.[7] The complaint included only one

count, styled "dental/medical negligence[,]" which we will refer to as "Dr. Jordan's

malpractice claim." Dr. Jordan supported this claim with a CQE,[8] which was executed by

Dr. Michael Kossak, a periodontist,[9] as the attesting expert. In that CQE, Dr. Kossak

certified his opinion that, to a reasonable degree of scientific and dental probability, Dr.

Elyassi and his practice deviated from the applicable standards of care in treating Dr.

Jordan, and that deviation was the proximate cause of Dr. Jordan's alleged injuries.

---

[7] Before filing suit in the circuit court, and under the requirements of the HCMCA, Dr. Jordan first filed her malpractice claim with HCADRO. She then waived arbitration with HCADRO, and an order of transfer was issued. This enabled Dr. Jordan to file suit in the circuit court. *See* Md. Code, Cts. & Jud. Proc. §§ 3–2A–02(a), 3–2A–04, 3–2A–06B.

[8] Under the HCMCA, a malpractice claim against a health care provider must be supported by a CQE that attests that (1) the defendant departed from the relevant standards of care, and (2) the departure proximately caused the alleged injury. Md. Code, Cts. & Jud. Proc. § 3–2A–04. If the plaintiff fails to file a valid CQE, then the claim must be dismissed without prejudice (unless the "sole issue" is lack of informed consent). Md. Code, Cts. & Jud. Proc. § 3–2A–04(b).

[9] The parties agree that periodontics is a related field to oral and maxillofacial surgery today, and that the fields have been related at least since the alleged malpractice here.

A period of initial discovery followed, with a particular focus on Dr. Kossak's credentials. Dr. Kossak obtained his D.D.S. degree in 1971. After completing a residency in periodontics, he taught periodontics for approximately two years in the 1970s as a full-time assistant clinical professor at Georgetown University. At that time, implants and bone grafting did not exist as treatment options, so Dr. Kossak did not teach those subjects as part of the periodontics curriculum. After leaving Georgetown, Dr. Kossak practiced periodontics for approximately 30 years, though he never became board certified in any specialty. Once the necessary technologies developed in the 1980s and 1990s, Dr. Kossak incorporated implants and bone grafting into his active periodontics practice. He retired in 2015, but returned to practice part-time two years later, seeing patients once per week through the first few months of 2021. Although he no longer placed implants during his part-time practice, he continued to perform bone grafts in certain cases. Dr. Kossak estimated that, throughout his 35-year career as a practicing periodontist, he served as an expert in legal proceedings only ten times in total.[10]

After confirming that Dr. Kossak had never been board certified in a specialty, Dr. Elyassi moved to strike the CQE and dismiss Dr. Jordan's malpractice claim. In so doing, Dr. Elyassi conceded that Dr. Kossak practiced periodontics within five years of the alleged malpractice at issue and that periodontics was a sufficiently related field (at least as of the time of the alleged malpractice). Dr. Elyassi, however, argued that Dr. Kossak

---

[10] This figure includes those times when Dr. Kossak was retained only in a consulting capacity and did not testify.

did not meet the board certification requirement and that his teaching experience in the 1970s was not recent enough to satisfy the statutory exception. Dr. Jordan disagreed, arguing that teaching experience in a related specialty should mean that the board certification requirement does not apply, regardless of when that teaching experience occurred.

After a hearing, the circuit court found that the board certification requirement and its exceptions were "ambiguous" and adopted Dr. Elyassi's interpretation.[11] The circuit court then granted Dr. Elyassi's motion, striking Dr. Jordan's CQE and dismissing her complaint with prejudice because her attesting expert had not taught medicine within five years of the alleged malpractice. Dr. Jordan timely appealed.

### THE PARTIES' CONTENTIONS

Dr. Jordan argues that Section 3–2A–02(c)(2)(ii) of the Courts and Judicial Proceedings Article, which sets forth the qualifications that an attesting health care provider must have to execute a CQE, is not ambiguous and should be interpreted as written. She explains that the section is structured in two parts, each of which imposes separate requirements on attesting experts. The first part outlines the basic experience requirements that all attesting experts must possess, regardless of whether the defendant is board certified in a specialty. *See* Md. Code, Cts. & Jud. Proc. § 3–2A–

---

[11] At that hearing, Dr. Elyassi conceded that Dr. Jordan had identified a board certified oral surgeon who would testify as to the standard of care at trial. Dr. Elyassi also conceded that this expert would meet the requirements of the HCMCA. Nevertheless, Dr. Elyassi asked the circuit court to dismiss Dr. Jordan's complaint because Dr. Kossak was not qualified, and it was Dr. Kossak who signed the CQE.

02(c)(2)(ii)(1)(A). It also contains a five-year recency requirement, meaning that an expert's experience will not satisfy the statutory requirements unless it occurred within five years of the date of the alleged malpractice. The second part imposes a board certification requirement on the attesting expert, but only if the defendant is board certified in a specialty. Even then, the statute provides two exceptions to the board certification requirement. *See* Md. Code, Cts. & Jud. Proc. §§ 3–2A–02(c)(2)(ii)(1)(A); 3–2A–02(c)(2)(ii)(2). Dr. Jordan points out that the exception at issue here (where the attesting expert "taught medicine in the defendant's specialty or a related field of health care") does not include any recency requirement—much less a five-year requirement. Thus, Dr. Kossak's prior teaching experience exempts him from the board certification requirement, even though that teaching experience occurred more than five years before the alleged malpractice here.[12]

Dr. Jordan further argues that the circuit court erred in dismissing her complaint with prejudice. Pointing to language in the HCMCA that provides only for dismissal without prejudice for the failure to file a valid CQE, she asserts that the circuit court did not have discretion to dismiss her complaint with prejudice.

In contrast, Dr. Elyassi argues that the five-year recency requirement in the first part of the statute also limits the exceptions to the requirements of the second part of the

---

[12] Dr. Jordan acknowledges that, at the time that her attesting expert taught medicine, the technologies used in periodontics and oral and maxillofacial surgery had not advanced to the point that they are at today. As such, she concedes that certain procedures used in treating her had not been developed at the time that her attesting expert taught medicine, and she agrees that her expert did not teach those procedures.

statute. Although he concedes that the statute "may not be ambiguous [when] read in a vacuum," he nevertheless asserts that "common sense" requires holding that the General Assembly intended to curtail the exception to board certification, narrowing its scope to situations where the teaching experience occurred within five years of the alleged malpractice. Dr. Elyassi further notes that, here, the attesting expert taught medicine over 40 years before the alleged malpractice at issue—before dental implants and bone grafts (the procedures used during Dr. Elyassi's treatment of Dr. Jordan) had been developed. Dr. Elyassi concedes that periodontics is sufficiently related to oral and maxillofacial surgery *today* with respect to this case. He urges us, however, to conclude that the fields are unrelated with respect to the attesting expert's teaching experience, which predated implants and bone grafts.

As to the circuit court's dismissal of Dr. Jordan's complaint, Dr. Elyassi argues that the circuit court had discretion to dismiss the complaint with prejudice and did not abuse its discretion by so doing. He asserts that the statute of limitations had run on Dr. Jordan's claim and that the claim would not otherwise survive. As such, he contends that a dismissal with prejudice would, at least as a practical matter, constitute a "distinction without a difference" that was within the circuit court's discretion to grant.

## STANDARD OF REVIEW

The sufficiency of a CQE is a question of law, and the standard "is the same as determining whether a complaint is legally sufficient"—that is, after assuming the truth of all assertions in the CQE and taking all permissible inferences in favor of its validity, we ask whether the CQE meets the requirements set forth in the HCMCA. *See Carroll v.*

8

*Konits*, 400 Md. 167, 179-80 & n.11 (2007). As with other questions of law, our review is *de novo*. *Amaya v. DGS Constr., LLC*, 479 Md. 515, 539-40 (2022). In interpreting statutory language, we bear in mind that the "cardinal rule" of statutory construction is to ascertain and give effect to the General Assembly's intent. *Id.* (quotations and citation omitted). As such, we first assess whether the statutory language is clear and unambiguous. *Peterson v. State*, 467 Md. 713, 727 (2020). If it is, we will not add or delete words or force a particular interpretation; we will simply interpret the language as written and end our inquiry:

> When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.

*Bellard v. State*, 452 Md. 467, 481 (2017); *see also Elsberry v. Stanley Martin Companies, LLC*, --- Md. ---, 2022 WL 17351619, at *7 (2022) ("This Court need not resort to other rules of statutory construction when the plain language of the statute unambiguously communicates the intent of the General Assembly."); *Graves v. State*, 364 Md. 329, 351 (2001) (courts cannot "invade the function of the legislature by reading missing language into a statute[,]" and are generally "incapable of correcting" legislative omissions, even when those omissions "appear[] to be the obvious result of inadvertence") (internal quotations omitted). "Even in instances when the language is

9

unambiguous, it is useful to review the legislative history of the statute to confirm that interpretation and to eliminate another version of legislative intent alleged to be latent in the language." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (quotations and citation omitted).

If the statutory language is ambiguous,[13] however, we engage in a broader inquiry by resolving the ambiguity "in light of the legislative intent, using all the resources and tools of statutory construction at our disposal." *Carroll*, 400 Md. at 192. (quotations and citation omitted). In that case, we may consider "not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives[,] and [the] purpose of the enactment[.]" *Id.* And we may interpret the language with regard to various indicia of legislative intent, including "the structure of the statute, including its title; how the statute relates to other laws; the legislative history[;] . . . the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions." *Witte v. Azarian*, 369 Md. 518, 525-26 (2002). In so doing, we will avoid any "absurd interpretation" of the statutory language, and we will interpret plain language "within the context in which it appears." *Peterson*, 467 Md. at 728; *see also Bellard*, 452 Md. at 482 ("In construing a statute, we avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.") (quotations and citation omitted).

---

[13] Statutory language is ambiguous "when there exist[s] two or more reasonable alternative interpretations of the statute." *Bellard*, 452 Md. at 481 (quotations and citation omitted).

Separately, in assessing a circuit court's decision to dismiss a complaint with prejudice, as opposed to without prejudice, we first must ask whether the circuit court had discretion to select one mode of dismissal over the other. If it did, then we review the circuit court's choice for an abuse of discretion. *See Bodnar v. Brinsfield*, 60 Md. App. 524, 538 (1984) ("At that point, the court has at least discretion to dismiss with prejudice. We hold that . . . [the circuit court] did not abuse [its] discretion in so dismissing [the complaint]."); *cf. Conwell Law LLC v. Tung*, 221 Md. App. 481, 498-99 (2015) (dismissal of an action for lack of jurisdiction, under Maryland Rule 2-507(b), is a discretionary matter that is reviewed for abuse of discretion); *Maddox v. Stone*, 174 Md. App. 489, 502 (2007) ("If the judge has discretion, he must use it and the record must show that he used it. He must use it, however, soundly or it is abused.") (quotations and citation omitted). If, however, the circuit court's choice is not a matter of discretion, we will not apply a deferential standard of review.[14] *Cf.*, *Colkley v. State*, 251 Md. App. 243, 289 (2021) (applying no deference in reviewing evidentiary determinations that, under the Maryland Rules, are not discretionary).

---

[14] Of course, in such a case, an abuse of discretion analysis would not change the result; it would simply be a different way to reach the same conclusion. This is because discretion is necessarily abused whenever it is exercised "without the letter or beyond the reason of the law." *Nelson v. State*, 315 Md. 62, 70 (1989).

DISCUSSION

## I.　LEGISLATIVE BACKGROUND

We first review the relevant legislative history and background. As we have explained, such history can be useful in confirming that statutory language is unambiguous, as well as in resolving ambiguity that might exist. Maryland's appellate courts have previously set out in detail the history and background of the HCMCA and its amendments. *See, e.g.*, *Breslin v. Powell*, 421 Md. 266, 278-286 (2011); *Debbas v. Nelson*, 389 Md. 364, 375-80 (2005); *Witte*, 369 Md. at 526-31; *DeMuth v. Strong*, 205 Md. App. 521, 538-42 (2012). As such, rather than retread this ground, we will summarize the relevant portions of the legislative background, adding to the discussion as necessary.

The HCMCA and its amendments evolved in response to multiple reported crises in Maryland's marketplace for medical malpractice insurance. *See* Final Report, Governor's Task Force on Medical Malpractice and Health Care Access (Nov. 2004) 1, 7 ("Task Force Report").[15] Beginning in the 1970s, insurance companies began to raise the alarm that medical malpractice expenditures were exceeding the premiums collected, resulting in deficits. Such a deficit prompted at least one insurer to plan an exit from Maryland and to refuse to allow doctors in Maryland to renew their malpractice insurance coverage. *See* Terry L. Trimble, *The Maryland Survey: 1994–1995: Recent Development:*

---

[15] The Task Force Report is available at https://msa.maryland.gov/megafile/msa/speccol/sc5300/sc5339/000113/000000/000455/unrestricted/20040962e.pdf.

*The Maryland General Assembly: Torts,* 55 Md. L. Rev. 893, 895 (1996); Kevin G. Quinn, *The Health Care Malpractice Claims Statute: Maryland's Response to the Medical Malpractice Crisis,* 10 U. Balt. L. Rev. 74, 77 (1980). The General Assembly responded in multiple ways, including passing the HCMCA in 1976. Among other things, this initial version of the HCMCA created an arbitration panel to resolve malpractice claims and mandated arbitration for certain claims. Either party could reject an arbitration award, and the claimant could then file suit. *See Debbas*, 389 Md. at 376-77.

This arbitration procedure "did little to resolve the crisis." *Id.* at 377. As such, in 1986, the General Assembly passed a significant amendment to the HCMCA, introducing CQE requirements in certain cases for both plaintiffs and defendants, codified at Section 3–2A–04(b) of the Courts and Judicial Proceedings Article. *DeMuth*, 205 Md. App. at 538-39. For plaintiffs, the CQE requirements were designed to serve a gatekeeping function, "'eliminat[ing] excessive damages and reduc[ing] the frequency of claims'"— thereby weeding out non-meritorious claims and ultimately reducing medical malpractice insurance expenditures. *DeMuth*, 205 Md. App. at 539 (quoting *Debbas*, 389 Md. at 378). These requirements proved more effective than arbitration at forwarding that goal, eventually prompting amendments to the HCMCA to permit waiver of arbitration. *See Witte*, 369 Md. at 526-31.

In 2004, Governor Robert Ehrlich, Jr. called a special session of the General Assembly to address what he termed a continuing "health care crisis in the State resulting from the rise in medical malpractice liability insurance costs . . . ." *DeMuth*, 205 Md. App. at 539-540 (citing Letter from Governor Robert Ehrlich, Jr. to Speaker Michael

13

Busch (Jan. 10, 2005), at 1) ("Jan. 10, 2005 Letter"). This special session focused on medical malpractice and ultimately amended the HCMCA, including by imposing the additional requirements for attesting experts who execute CQEs (and certain exceptions to those requirements) that are at issue here. *DeMuth*, 205 Md. App. at 539-42 (providing a detailed history of those amendments); *see also* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2). The bill initially supported by the Governor, the Maryland Medical Injury Compensation Reform Act, H.D. 0001, 2004 Leg., 419th Sess., 1st Spec. Sess. (Md. 2004), would have enacted significantly tighter requirements for experts to sign CQEs than the law as codified today. Specifically, the Governor's bill would have required that such an expert have prior clinical experience, consulting experience related to clinical experience, or teaching experience—all within one year of the alleged malpractice at issue (and in a related specialty). Additionally, if the defendant was board certified in a specialty, the Governor's bill would have further required that the attesting expert be board certified in a related specialty unless the malpractice stemmed from care outside of the defendant's board certified specialty. Unlike the current law, the Governor's bill would have provided no exception to the board certification requirement for teaching experience.

Ultimately, the House of Delegates passed a different bill, which eventually became law and added Section 3–2A–02(c)(2) to the Courts and Judicial Proceedings Article. *See* Maryland Patients' Access to Quality Health Care Act of 2004, H.D. 0002, 2004 Leg., 419th Sess., 1st Spec. Sess. (Md. 2004) ("House Bill 2"). *DeMuth*, 205 Md. App. at 540. As originally drafted, House Bill 2 contained similar requirements for

14

attesting experts as the Governor's bill, but it only required an expert signing a CQE to have clinical, consulting, or teaching experience in a related field within five years of the alleged malpractice at issue—not one year. As to the board certification requirement (in cases of board certified defendants), House Bill 2 originally contained the same language as the Governor's bill, but by its third reading, House Bill 2 was amended to include the additional exception at issue here, which exempts experts who "taught medicine" in a related field from the board certification requirement.

Governor Ehrlich vetoed House Bill 2, stating that the bill was "woefully inadequate" to meaningfully reduce malpractice premiums in Maryland. Jan. 10, 2005 Letter, at 3-4. In his nine-page letter explaining the reasons for the veto, Governor Ehrlich raised several criticisms of House Bill 2, including that it did not go far enough in capping plaintiffs' economic and noneconomic damages. Jan. 10, 2005 Letter, at 3. Relevant here, the Governor also cited a few "miscellaneous issues" at the end of his letter, among them, that the bill had "watered down" his desired provisions concerning expert witnesses. Those provisions, said the Governor, had been designed to "prevent the prevalent use of 'hired gun' experts who do not practice medicine but instead have become experts for hire." Jan. 10, 2005 Letter, at 8. The Governor's veto letter also cited the removal of a provision that would have adopted the *Daubert* standard for expert witnesses.[16] Jan. 10, 2005 Letter, at 8. The Governor noted that the effect of the

---

[16] At the time, Maryland had not yet adopted the *Daubert* standard, as articulated by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) and its progeny. This has since changed. *See Rochkind v. Stevenson*, 471 Md. 1 (2020).

15

provisions concerning expert witnesses and the *Daubert* standard was "difficult to quantify" but nonetheless, he asserted that those provisions "likely would have reduced" malpractice insurance costs in Maryland. Jan. 10, 2005 Letter, at 8.

Despite the Governor's objections, House Bill 2 was enacted by a veto override the following day. *See DeMuth*, 205 Md. App. at 540.[17]

## II. THE EXCEPTION TO BOARD CERTIFICATION FOR EXPERTS WHO TAUGHT MEDICINE DOES NOT HAVE A FIVE-YEAR RECENCY REQUIREMENT.

Dr. Elyassi contends that the exception to the board certification requirement for experts who "taught medicine," which is contained in Section 3–2A–02(c)(2)(ii) of the Courts and Judicial Proceedings Article, should only apply in cases where the attesting expert taught within five years of the alleged malpractice at issue. The relevant CQE requirements state as follows:

> (ii) 1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:
>
> > A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action; and

---

[17] House of Delegates and Senate committee proceedings were not routinely recorded until 2011. As such, aside from the legislative history discussed above, there is little else to reveal the purpose and intent of the 2004 amendments as they relate to the qualifications of attesting experts. *See Breslin*, 421 Md. at 286 ("The legislative history illuminating the purpose of this amendment is scant.").

16

> B. *Except as provided in subsubparagraph 2 [below], if the defendant is board certified in a specialty, shall be board certified in the same or a related specialty as the defendant.*
>
> 2. [1B] does not apply if:
>
>> A. The defendant was providing care or treatment to the plaintiff unrelated to the area in which the defendant is board certified; or
>>
>> B. *The health care provider taught medicine in the defendant's specialty or a related field of health care.*

*See* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii) (emphasis added).[18]

In interpreting the exception for providers who "taught medicine," we bear in mind precedent from the Supreme Court of Maryland (at the time named the Court of Appeals of Maryland).[19] On multiple occasions, the Court has held the HCMCA's language to be unambiguous, at least with respect to the CQE requirements. *See Breslin*, 421 Md. at 268-69 ("[W]e held that the language of the [HCMCA] is clear and its meaning unambiguous. . . . We shall stick to our guns in that regard as we consider the requirements of a [CQE] in . . . [Section] 3–2A–02, added in 2004.") (cleaned up); *cf. Walzer v. Osborne*, 395 Md. 563, 581 (2006) (reasoning that "we need not, and should not, look beyond the [HCMCA]" because it is "clear and its meaning unambiguous" with

---

[18] The HCMCA sometimes refers to standards of care as "standards of practice[.]" *See* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(1).

[19] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. *See, also*, Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland….").

respect to other CQE requirements contained at Section § 3–2A–04 of the Courts and Judicial Proceedings Article) (citing *Jones v. State*, 336 Md. 255, 261 (1994)).

The Court has also explained that statutes in derogation of the common law, such as the HCMCA, should be "strictly construed" to avoid altering the common law beyond what is expressly stated in the statute. *See Breslin*, 421 Md. at 287 (quotations and citation omitted).[20] In analyzing CQE requirements in particular, the Court has cautioned that these types of requirements impede a "recognized common law right of action" by imposing threshold barriers to suit, barriers that could raise "serious" constitutional questions if given an interpretation that unreasonably impedes such suits. *Witte*, 369 Md. at 533.[21] Indeed, those constitutional concerns predated the requirements at issue here (which have since imposed further barriers), and so those concerns must apply with even greater force today. This means that we must exercise caution in interpreting the CQE requirements at issue, ensuring that our read of those restrictions is no broader than the General Assembly intended.

---

[20] "Most statutes, of course, change the common law, so that principle necessarily bends when there is a clear legislative intent to make a change." *Witte*, 369 Md. at 533.

[21] Specifically, Article 19 of the Maryland Declaration of Rights provides "[t]hat every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay[.]" The Supreme Court of Maryland cited this constitutional provision and others in interpreting earlier CQE requirements under Section 3–2A–04(b) of the Courts and Judicial Proceedings Article, and in cautioning that courts should be wary of construing CQE requirements too broadly. *See Witte*, 369 Md. at 533 & n.2.

Finally, as we interpret the HCMCA's provisions, we are also mindful of the purpose of that act. The HCMCA was enacted to "weed out non-meritorious medical malpractice claims but not to create roadblocks to the pursuit of meritorious medical malpractice claims . . . ." *Hinebaugh v. Garrett Cnty. Mem'l. Hosp.*, 207 Md. App. 1, 18 (2012). As such, we have stated that our interpretation of the HCMCA should not go beyond the legislative intent by erecting roadblocks to meritorious actions:

> As the history of the [HCMCA] makes plain, the tort reform objective never has been to eliminate or limit liability in meritorious medical malpractice cases. Rather, the objective has been to cull out non-meritorious cases early in the litigation process so as to reduce the cost of defense, which contributes to the high cost of malpractice insurance, and to prevent significant verdict awards in cases that are not medically meritorious but engender great sympathy, which also contribute to the high cost of malpractice insurance. Thus, in assessing the meaning of the statutory subsubparagraphs at issue, our interpretation must not be so broad as to result in the consequence, clearly not intended by the legislature, of placing roadblocks to recovery in meritorious medical malpractice cases.

*DeMuth*, 205 Md. App. at 541-42.

Turning to the plain language of the exception at issue, we find that it is not ambiguous. By its terms, the exception applies to experts who "taught medicine in the defendant's specialty or a related field of health care." Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii)(2)(B). The natural reading of "taught medicine" is not time-bound. It refers equally to teaching experience in the recent past and in the distant past. A newly retired professor, for instance, could be said to have "taught medicine," just the same as a professor who taught decades ago. Put another way, the language used in the "taught medicine" exception is not subject to multiple reasonable interpretations; it is simply subject to a single broad interpretation. As such, it is not ambiguous. *Cf. State Highway*

19

*Admin. v. Greiner Eng'g Servs.* 83 Md. App. 621, 636 (1990) ("The 'no damages' provision, broad as it is in scope, is not ambiguous.") (quoting *W. Eng'rs, Inc. v. State By and Through Rd. Comm'n*, 437 P. 2d 216, 218 (Utah 1968)) (internal quotations omitted).

Dr. Elyassi, however, appears to assert that there is an implicit ambiguity in the statutory language, and he argues that such an ambiguity "emerges" upon closer inspection. He relies upon Section 3–2A–02(c)(2) as a whole and notes that the board certification requirement and its exceptions are preceded by the word "and"—meaning that they exist in addition to, and not apart from, the recency requirement contained earlier in the statutory language. As such, Dr. Elyassi contends that one possible reading of the "taught medicine" exception is that it, too, includes the five-year recency requirement, *see* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii)(1)(A), thereby placing a five-year limit on how long an expert who "taught medicine" can oppose a board certified health care provider. We disagree.

Put simply, Dr. Elyassi's alternative reading requires too many logical and structural leaps to be reasonable. To accept his reading, one must set aside what Section 3–2A–02(c)(2)(ii)(2)(B)'s phrase "taught medicine" says, as well as its implementation of an exception to the board certification requirement of Section 3–2A–02(c)(2)(ii)(1)(B). Instead, one must conclude that what "taught medicine" actually means is "taught medicine . . . within 5 years of the date of the alleged act or omission" *à la* Section 3–2A–02(c)(2)(ii)(1)(A). One must also overlook the plain words of Section 3–2A–02(c)(2)(ii)(1)(B). This provision begins "[e]xcept as provided in subsubparagraph 2[.]" *See* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii)(1)(B). The five-year limit is *not*

20

expressly contained anywhere in "subsubparagraph 2"—the only way it could appear there is if we were to read it in by implication. *See* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii)(1)(A).

This we will not do. To refer to a narrower category of teaching experience (such as only recent teaching experience), the General Assembly would have needed to add words to the "taught medicine" exception—much as it did elsewhere by employing the phrase "within 5 years of the date of the alleged act or omission[.]" *See* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii)(1)(A). Certainly, the General Assembly could have done so. But we cannot add words to a statute to change its meaning, even were we to imagine a reason for doing so.

Moreover, the omission of a temporal limit on teaching experience here appears to have been intentional. By including a five-year limit in a different part of the same statutory section, the General Assembly not only illustrated that the phrase "taught medicine" is not naturally time-bound, but also demonstrated that it knew how to impose a time restriction on that phrase when it so desired. *See* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii)(1)(A). The presence of the limit in a different part of the statute suggests that the omission of the limit from the "taught medicine" exception was a conscious choice. Indeed, when the bill was vetoed, the Governor's accompanying letter alleged certain defects and "watered down" language in the bill's provisions involving expert witnesses, essentially flagging this issue for the General Assembly. The Governor's veto was overridden, and the bill was enacted into law without any changes to the CQE requirements.

Dr. Elyassi nonetheless argues that the exception as written defies common sense. He reasons that because the statute was designed to impose heightened CQE requirements when the defendant is board certified, the exception's plain language cannot mean what it says because heightened CQEs requirements will not always be imposed in practice. Although he does not provide a specific example on appeal, we can think of one: an expert might satisfy the recency requirement through recent teaching experience, *see* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(iii)(1)(A), and then need nothing further in order to satisfy the exception to the board certification requirement. In effect, the expert's recent teaching experience could do double duty.

Contrary to Dr. Elyassi's argument, however, we think this makes sense. The first part of the statute imposes a general five-year recency requirement, regardless of the defendant's board certification. This recency requirement means that every expert must have sufficiently current experience (clinical, consulting, or teaching) in the same or a related field. As such, the recency requirement helps to ensure that the expert's knowledge is up to date. If the defendant is board certified (and providing care within the scope of that board certification), the second part of the statute imposes additional requirements aimed at the credentials of the expert. To oppose a board certified defendant, an expert needs more than up-to-date knowledge—the expert also needs sufficiently weighty credentials, either in the form of a relevant board certification or teaching experience. For many experts (i.e., those who meet the recency requirement through clinical or consulting experience), this means that they will need further credentials to meet the board certification requirement. Of course, an expert who satisfies

22

the recency requirement through teaching experience will not need anything further. But this also makes sense: recent teaching experience could demonstrate *both* that one's skills are up to date, and that one possesses sufficient credentials.[22]

In sum, the plain language of the "taught medicine" exception is not ambiguous and does not contain any temporal limit, much less a five-year limit. The General Assembly demonstrated that it knew how to impose such a limit, but it did not do so here. And even if we were to find the statutory language ambiguous, we would hesitate to resolve that ambiguity by bolstering the CQE requirements for attesting experts, without some clearer indication that this was the General Assembly's intent. Additional CQE requirements are threshold barriers, they shrink the pool of available experts, they could raise serious constitutional problems, and they frustrate one of the goals of the HCMCA by potentially erecting roadblocks to meritorious claims.

### III. THE ARGUMENT THAT TECHNOLOGICAL DEVELOPMENTS COULD RENDER UNRELATED AN OTHERWISE-RELATED FIELD OF HEALTHCARE IS NOT PRESERVED.

Next, Dr. Elyassi argues that, even if there is no temporal limit to the "taught medicine" exception, the attesting expert's teaching experience here occurred so long ago that we should not deem it experience in a "related" field within the meaning of Section

---

[22] The facts before us further demonstrate that the statutory language does not defy common sense. Dr. Kossak had recent clinical experience, and no party asserts that his knowledge was not up to date or that he was unfamiliar with the specific procedures employed in treating Dr. Jordan. Indeed, Dr. Kossak employed those same procedures many times throughout his long clinical practice. Separately, as a former university professor who taught for approximately two years in a related field, Dr. Kossak also appears to have sufficient credentials.

3–2A–02(c)(2)(ii) of the Courts and Judicial Proceedings Article. That is, Dr. Elyassi appears to argue that periodontics and oral and maxillofacial surgery should not be considered related as of the 1970s, when the attesting expert taught periodontics, because at that time implants did not exist. To make his argument, Dr. Elyassi first assumes that the appropriate comparison is between periodontics in the 1970s and oral and maxillofacial surgery *today*. Building from that assumption, he then presents a novel theory: that technological advancement could sufficiently change a field of healthcare (here, periodontics), such that an expert's experience predating that technology would not qualify as experience in a "related" field under the HCMCA, at least in cases where that technology was used.

We begin by reviewing the "related" requirement. *See* Md. Code, Cts. & Jud. Proc. § 3–2A–02(c)(2)(ii). We have held that specialties and fields of health care are "related" if, "there is an overlap in treatment or procedures within the specialties and therefore an overlap of knowledge . . . among those experienced in the fields or practicing in the specialties, and the treatment or procedure in which the overlap exists is at issue in the case." *Hinebaugh*, 207 Md. App. at 18; *see also DeMuth*, 205 Md. App. at 544 ("[T]he word 'related' in the sense of associated or connected . . . embraces fields of health care and board certification specialties that, in the context of the treatment or procedure in a given case, overlap."). Specialties and fields of health care may still be related even if they are "regulated by different boards, require different training regimens, or concern different aspects of human anatomy or physiology." *DeMuth*, 205 Md. App. at 544. The critical aspect of the analysis is whether "the standard of care for [the] treatment

24

would not differ depending upon which specialist was the one to see the [patient] for treatment." *Id.* at 544.

In performing that analysis, we have looked to the specific context of the treatment of the patient. In *Hinebaugh*, for instance, we framed the relevant context as "diagnosing, on a front line basis, [] the medical condition of a patient who had been hit in the face by another person and is experiencing pain." 207 Md. App. at 23. In that context, we found that oral and maxillofacial surgery was not sufficiently related to family medicine. The former types of providers were not "front line providers" who could attest to the standard of care for an "initial diagnosis" of facial fractures. Instead, they were specialists who were typically "brought into a case upon referral or request, usually when a facial fracture diagnosis has already been made[.]" *Id.* at 28. In the context of that case, oral and maxillofacial surgeons necessarily operated under a different standard of care from family medicine practitioners. We reached this conclusion even though oral and maxillofacial surgeons and family medicine practitioners use similar procedures and technologies (for instance, x-rays and CT scans) to diagnose facial fractures, because oral and maxillofacial surgeons do not regularly diagnose facial fractures "upon initial presentation of a patient." *Id.* at 28.

Likewise, in *DeMuth* and *Nance*, we applied similar analyses to reach the opposite conclusion: that two specialties or fields of health care were related. In *DeMuth*, we addressed whether vascular surgery was sufficiently related to orthopedic surgery in the context of managing vascular complications for orthopedic surgery patients. 205 Md. App. at 545-46. Although orthopedic surgeons encounter different risks and treat a

different variety of ailments from vascular surgeons, we held that the two fields were sufficiently related, in the context of the case, because "the central standard of care" was the same across both fields for diagnosing and treating possible vascular complications of orthopedic surgery. *Id.* at 546. Similarly, in *Nance*, we treated nephrology and urology as related because both fields involved the diagnosis of kidney diseases in an emergency room setting (meaning, in the context of that case, an expert in one field should be able to opine as to the standard of care for a practitioner in the other). *See Nance v. Gordon*, 210 Md. App. 26, 40-41 (2013).

In this case, however, we need not engage in a detailed review of the similarities and differences between periodontics and oral and maxillofacial surgery. Dr. Elyassi concedes that (at least since the development of implantology), the two fields of health care are sufficiently similar here—both types of specialists treat patients in the context in which Dr. Jordan presented to Dr. Elyassi, pursuant to the same standards of care. Further, we decline to reach Dr. Elyassi's novel argument because it was not adequately presented to nor decided by the circuit court. *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue [aside from jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court[.]").[23]

---

[23] We have taken a similar approach on several occasions where the circuit court did not (or was not given the opportunity to) decide an issue pressed on appeal. *See, e.g.*, *Nouri v. Dadgar*, 245 Md. App. 324, 362-63 (2020) (refusing to reach multiple arguments that were not decided by the circuit court); *Miller-Phoenix v. Baltimore City Bd. of Sch. Comm'rs*, 246 Md. App. 286, 305 n.9 (2020) (refusing to affirm a grant of summary judgment on an alternative ground because "[t]he Board did not seek summary judgment on that basis . . . and the circuit court did not consider or rule on it"); *Weatherly v. Great*

26

"'[F]airness and judicial efficiency ordinarily require that all challenges . . . be presented in the first instance to the trial court so that (1) a proper record can be made . . . and (2) the other parties and the trial judge are given an opportunity to consider and respond . . . .'" *Harris v. State*, 251 Md. App. 612, 660 (2021) (quoting *Chaney v. State*, 397 Md. 460, 468 (2007).

Here, the circuit court did not rule on whether the development of implantology meant that Dr. Kossak's experience was not in a "related field." Nor was the circuit court given an adequate opportunity to do so. During the hearing before the circuit court, Dr. Elyassi noted that implants did not exist at the time that Dr. Kossak taught periodontics, but he never asserted that this meant that Dr. Kossak's periodontic teaching experience was not in a related field. Instead, he explained to the circuit court that he merely intended "to point out that any knowledge, experience, or expertise that can be imputed to [Dr. Kossak] by virtue of the fact that he taught . . . is wholly inapplicable to the issues in this case."[24] The issue, said Dr. Elyassi, was that Dr. Kossak never taught the placement of implants. As such, the circuit court did not base its holding on whether Dr. Kossak's teaching experience was in a related field. Instead, the circuit court explained that it was

---

*Coastal Exp. Co.*, 164 Md. App. 354, 385 (2005) ("Critical to our determination of an issue on appeal is the trial court's opportunity to consider the issue.").

[24] He did assert that Dr. Kossak did not teach in the "field of implant dentistry[,]" but also conceded in the circuit court that this 'field' is not a recognized specialty and that there is no board certification for implantology.

dismissing the complaint because, in its view, the "taught medicine" exception to board certification contained a five-year recency requirement, which Dr. Kossak did not meet.

Moreover, neither Dr. Elyassi nor Dr. Jordan put on any argument or evidence concerning how the periodontics of the 1970s differed from oral and maxillofacial surgery—either today or in the 1970s—other than to agree that implants did not then exist. For instance, neither party discussed the context in which 1970s periodontists saw patients, or addressed the treatment options that were available to 1970s periodontists to argue whether such periodontists could opine on the relevant standard of care.[25] Additionally, neither party made statutory interpretation arguments in the circuit court that were germane to the "related field" requirement, or that could have informed a ruling about how to interpret that requirement with respect to technological changes and to teaching experience predating those changes.

In short, this issue was never squarely presented to the circuit court, nor was it decided. Now, on appeal, we are left without the benefit of an adequate record, germane arguments from the parties, and a decision from the circuit court that could inform our analysis. We will decline to review this issue. *See* Md. Rule 8–131(a).

---

[25] We have at times taken judicial notice of *present-day* specialty descriptions from authoritative sources. *See, e.g.*, *Hinebaugh*, 207 Md. App. at 22-24. But we have not taken notice of historical descriptions of medical specialties in the context of the HCMCA. And here, the relevant time would be roughly 50 years ago, making judicial notice even less appropriate. *See Faya v. Almaraz*, 329 Md. 435, 444 (1993) (courts can take judicial notice of "matters of common knowledge or capable of certain verification"); *Irby v. State*, 66 Md. App. 580, 586 (1986) (judicial notice can be appropriate "when formal proof is clearly unnecessary") (quotations and citation omitted).

28

## IV. IN THE ALTERNATIVE, THE CIRCUIT COURT ERRED IN DISMISSING DR. JORDAN'S COMPLAINT WITH PREJUDICE

Under Section 3–2A–04(b)(1)(i) of the Courts and Judicial Proceedings Article, if the plaintiff fails to file a valid CQE, then the court must dismiss the action without prejudice:

> [A] claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint.

*See* Md. Code, Cts. & Jud. Proc. § 3–2A–04(b)(1)(i); *see also Breslin*, 421 Md. at 290 ("[F]iling a Certificate of an unqualified expert, in contravention of [Cts. & Jud. Proc.] § 3–2A–02, mandates dismissal without prejudice of the claim or action[.]"); *Dunham v. Univ. of Md. Med. Center*, 237 Md. App. 628, 659 (2018) ("[P]ursuant to the plain language of [Section 3–2A–02], dismissal *without* prejudice of the underlying claim for the filing of a non-compliant [CQE] . . . is required.") (emphasis in original) (quotations and citation omitted).

Here, the circuit court dismissed Dr. Jordan's complaint with prejudice for a purported failure to file a valid CQE, on the theory that the statute of limitations had run and that a dismissal without prejudice would have had the same effect. Dr. Elyassi argues that this decision was not error because there would be no practical distinction between dismissal with or without prejudice here.[26] This argument misses the mark, however,

---

[26] Dr. Elyassi did not cite to any authority for his argument that a dismissal with prejudice was within the circuit court's power here. We note that, in *Reed v. Cagan*, 128

because the HCMCA does not afford any discretion to dismiss a complaint with prejudice for the failure to file a valid CQE. *See* Md. Code, Cts. & Jud. Proc. § 3–2A–04(b)(1)(i). As such, as an independent ground for reversal, the circuit court erred in dismissing Dr. Jordan's complaint with prejudice.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; COSTS TO BE PAID BY APPELLEES.**

---

Md. App. 641 (1999), this Court heard an appeal from a dismissal under Maryland Rule 2-507(b), which concerns dismissals for failure to obtain jurisdiction over defendants after 120 days since original process was issued. Like the section of the HCMCA at issue here, Rule 2-507 only allows for dismissal without prejudice, *see* Md. Rule 2-507(f), but this Court affirmed a dismissal with prejudice of claims against a belatedly-served defendant. *Reed*, however, did not analyze that issue; it analyzed whether the defendant was prejudiced by a delay in service and whether that defendant had a right to file a motion to dismiss before a notice of contemplated dismissal was entered. *Reed*, 128 Md. App. at 647-51. As such, and as the Supreme Court of Maryland has explained, *Reed* does not teach that a dismissal with prejudice is proper under Maryland Rule 2-507. *See Hariri v. Dahne*, 412 Md. 674, 685 (2010). *Reed* accordingly does not support Dr. Elyassi's argument here. Indeed, the Court later clarified that "[t]he plain language of [Maryland Rule 2-507] expressly provides that the dismissal entered on the docket be 'without prejudice.'" *Hariri*, 412 Md. at 684-85.